**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

CASE NO. 9:12-CV-80247-DMM

BVS ACQUISITION CO., LLC,
a Delaware Limited Liability Company, and
ARTHUR W. HOOPER, JR., an individual,

        Plaintiffs,

vs.

RORY A. BROWN, an individual,

        Defendant.

_____/

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 54(b), Federal Rules of Civil Procedure, Plaintiffs BVS ACQUISITION

CO., LLC, and ARTHUR W. HOOPER, JR., move for reconsideration of and to vacate the

Court's Order Granting Defendant Brown's Motion for Summary Judgment Dismissing Third

Amended Complaint ("Order") [DE 221], and state as follows:

**I.**     **Introduction**

The Court in its Order misconstrued material and fundamental facts that formed the basis

of the Court's findings, creating clear error and resulting in manifest injustice.  In addition,

newly-discovered evidence contradicts key factual findings made by the Court and demonstrates

the existence of genuine issues of material fact, precluding summary judgment.

**II.**     **Legal Standard for Motion for Reconsideration of a Non-Final Order**

Because the Order on summary judgment is a non-final order, it is subject to revision at

any time prior to entry of final judgment.  *See James River Ins. Co. v. Fortress Sys., LLC*, 11-

60558-CIV-COHN, 2012 WL 6738534 (S.D. Fla. 2012) (citing Fed.R.Civ.P. 54(b)).    While Rule 54(b) does not set forth a standard for reconsideration, "the Advisory Committee Notes make clear that 'interlocutory judgments ... are left subject to the complete power of the court rendering them to afford such relief as justice requires.'" *Grupo Televisa v. Telemundo Communs. Group, Inc.,* Case. No. 04–20073–CIV, 2007 U.S. Dist. LEXIS 95914, at *3, (S.D. Fla. Oct. 11, 2007) (quoting Fed.R.Civ.P. 54(b), Advisory Committee's Note).

The purpose of a motion for reconsideration "is to correct manifest errors of law or fact or to present newly discovered evidence." *Burger King Corp. v. Ashland Equities, Inc.,* 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002).  The movant "must demonstrate why the court should reconsider its prior decision and set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Reyher v. Equitable Life Assur. Soc.,* 900 F. Supp. 428, 430 (M.D. Fla. 1995).

Three circumstances support reconsideration: "'(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice.'"  *James River Ins. Co.*, 2012 WL 6738534 at *3 (citing *Burger King,* 181 F. Supp. 2d. at 1369).  This motion sets forth both newly discovered evidence and clear error, in view of the facts.

When reconsideration is based on newly discovered evidence, the movant "must show that (1) the evidence is newly discovered…; (2) the movant exercised due diligence to discover the new evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that a new trial would probably produce a new result."

*Willard v. Fairfield S. Co., Inc.*, 472 F.3d 817, 824 (11th Cir. 2006).[1]  Here, the newly discovered evidence was, in fact, late-produced evidence, which Plaintiffs could not have reviewed prior to close of briefing or the entry of the summary judgment order, because it was produced after briefing on the motion had closed, and, in part, after the Order had been entered.

A motion for reconsideration may not merely reargue points that already were rejected by the court.  *See Michael Linet, Inc. v. Vill. of Wellington,* 408 F.3d 757, 763 (11th Cir. 2005).  A motion for reconsideration "would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Compagnoni v. United States*, No. 94–813–Civ, 1997 WL 416482, at *2 (S.D. Fla. May 13, 1997).

This Court has said that the justification for relief must be "so compelling that the district court [is] required to vacate its order." *In re Trasylol Prods. Liab. Litig*., 08-MD-01928-DMM, 2012 WL 1021799 (S.D. Fla. 2012) (internal citations omitted).  But, when newly discovered evidence would change the outcome, or when a court has committed a clear error of law or fact in its original ruling, relief should be granted. *See, e.g., Niland v. Delta Recycling Corp*., No. 03-80259-civ-DMM, 2003 WL 21939781 (S.D. Fla. 2003) (vacating an order denying summary judgment, when defendant demonstrated the original order denying the motion was based on errors of law and fact), *aff'd*, 377 F.3d 1244 (11th Cir. 2004).

We show below why this Motion satisfies the standards for reconsideration and why, in this case, genuine issues of material fact preclude entry of summary judgment.

---

[1] Courts view the standard under Rules 59(e), 60(b), and 54(b) as similar.  *See, e.g., Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 805-06 (11th Cir. 1993) (finding "no reason to apply a different standard" when party seeks reconsideration of non-final order pursuant to Rule 54(b) versus Rule 59(e) or Rule 60(b) motion for reconsideration).

### III.  **Facts Fundamentally Misapprehended by the Court**

In reaching its decision to enter summary judgment for Defendant Rory Brown on the negligent misrepresentation and breach of fiduciary duty claims in the Third Amended Complaint, the Court assumed facts that were material to its decision, but were contrary to the facts presented to the Court and/or are contradicted by newly-discovered evidence.

### A.  **Plaintiffs Were Wealth Management Clients of the Bank**

The Court misunderstood the record with regard to the relationship between Plaintiffs and Lydian Bank and Brown, which, contrary to the Court's finding, was a fiduciary relationship. The Order implicitly found that Plaintiffs never became wealth management clients of the Bank. *See* DE 221, p. 2 (describing Plaintiffs as "*potential* wealth management clients of Lydian Bank") (emphasis supplied).

In fact, Plaintiffs *were* wealth management clients of Lydian Bank, and once their money had been deposited with the Bank for the express goal of investing, Brown, as one of Plaintiffs' investment advisors at the Bank, persuaded Plaintiffs to invest in the Bank itself, rather than in the other investment opportunities presented to Plaintiffs.  *See* DE 179, ¶¶ 15, 18-20 (Plaintiffs' Response to Defendant's Rule 56.1 Statement of Facts ("Response")).

Newly-discovered evidence confirms that Plaintiffs were wealth management clients of the Bank.  BVS entered into a Wealth Management Agreement with the Bank, as evidenced by document number BBSH02222-2230, that was located after summary judgment.  *See* December 19, 2012 Declaration of Louis Ceruzzi, attached as Exhibit A.[2]  In addition, document number

---

[2] As Ceruzzi declared, this document was discovered only recently as a result of looking through files that were not associated with this matter.  Moreover, although this document should have been included in the numerous documents provided by the FDIC and Sabadell, the Bank's successor, this document does not appear in any of those productions to Plaintiffs.  *See* Declaration of Erin Kolmansberger, Esq. ("Kolmansberger Decl."), Exhibit B at ¶ 10.  In any

FDIC-P-000157657-659,[3] attached as Exhibit C, confirms that Hooper authorized Ellis to withdraw funds from Hooper's and BVS's wealth management accounts at the Bank to purchase the Bank shares.  In a later email in the same document, Boldman, the Bank's General Counsel, confirmed that "it is my understanding we are moving the funds directly from [Hooper's] *wealth management account*."  *See* FDIC-P-000157657-659, Exhibit C (emphasis supplied).  Thus, not only did Plaintiffs understand that their monies had been deposited in their wealth management accounts, but the Bank confirmed that Plaintiffs were wealth management clients.

In light of this newly discovered evidence, previously available discovery presented to the Court can be examined in context.  With respect to BVS, its principal, Ceruzzi, deposited $9 million with Lydian Bank "to be used for wealth management."  *See* DE 179-1 at 36:20-24 (Excerpts of Deposition of Louis Ceruzzi ("Ceruzzi Tr."), Exhibit A to Response).  BVS received investment advice from the Bank, and the Bank acted as BVS's fiduciary with respect to those funds.  *See* DE 179-10 (Declaration of Louis Ceruzzi ("Ceruzzi Decl.") (Exhibit J to Response). **The Bank acknowledged that BVS was a wealth management client.**  *See* DE 179-11 (Lydian Private Bank's Relationship Management form for Ceruzzi and BVS, filed under seal as Exhibit K to Response) (reflecting $6 million deposited in "wealth management" account); DE 179-12 (Lydian Loan Approval Sheets, filed under seal as Exhibit L to Response) (reflecting $6 million wealth management balance for BVS).

Likewise, Hooper executed an investment management agreement with the Bank.  *See* DE 179-2 at 80:13-25 (Excerpts of Deposition of Arthur Hooper ("Hooper Tr.") (Exhibit B to

---

event, even if the FDIC or Sabadell had produced this document, it would not have been available prior to entry of the Order.  *See, generally,* Kolmansberger Decl.

[3] This document was produced by the FDIC on October 29, 2012, after briefing on summary judgment closed.  Kolmansberger Decl., Exhibit B at ¶ 9, Exhibit A.

Response)) (referencing Investment Management Agreement between Hooper and Lydian Bank, Document No. BBSH01758-59, excerpt of Exhibit 49, attached as Exhibit D).  Hooper received investment advice from Brown and others at the Bank. *See* DE 179-2 at 39:4-8 and 41:11-42:5; 77:16-79:5; 103:13-104:9 (Hooper Tr., Exhibit B to Response).  The Bank also acknowledged that Hooper was a wealth management client of the Bank.  *See* DE 179-13, Hooper's Lydian Loan Approval Sheet filed under seal as Exhibit M to Plaintiffs Response to Defendant's Motion for Summary Judgment (noting that Hooper will establish and maintain a Wealth Management Account).

The Court determined there was no fiduciary relationship between Plaintiffs and Brown. But, such a finding makes sense only if Plaintiffs were never wealth management clients of the Bank. Once Plaintiffs became wealth management clients of the Bank, a fiduciary relationship was established between Plaintiffs, the Bank, and the Bank's agents, including Brown.  And, when any Bank employee or officer gave Plaintiffs investment advice, as Brown did, a fiduciary relationship was created.

Any doubt about Plaintiffs' status as wealth management clients of the Bank, because this is a material fact, should be resolved in favor of Plaintiffs, the non-moving parties.

This factual conclusion is of paramount importance, as it sets the framework for both the breach of fiduciary duty claim and the negligent misrepresentation claim.  The Order notes that there is "no evidence that … Plaintiffs' purported status as wealth management clients affected their decision to invest."  DE 221 at 15.  But that conclusion misses the point.  As explained more fully below, the wealth management relationship between Plaintiffs and the Bank established a fiduciary relationship between Plaintiffs and the Bank and its officer and agent, Brown.  Indeed, Plaintiffs understood that the Bank and Brown, as wealth management advisors,

owed Plaintiffs a duty of honesty and loyalty in providing investment advice, particularly when

that advice was to invest in the Bank itself.  Hooper's testimony demonstrates the trust he placed

in Brown, Ellis, and the Bank:

> Q.    Did you ever consider hiring counsel for yourself in connection with that
> investment?
>
> A.   I did not.
>
> Q.   Was there a reason why you didn't?
>
> A.   We had two experts working for us giving us information on the bank.
>
> Q.   Being whom?
>
> A.    Rory Brown and Jerry Ellis, two of the most knowledgeable people in
> Lydian Bank.

DE 179-2 at 62:24-63:23 (Hooper Tr. Exhibit B to Response).[4]

Because Brown was a fiduciary to Plaintiffs, when Brown solicited Plaintiffs to invest in

his Bank, he was required to provide Plaintiffs with accurate information.  And, as a fiduciary,

Brown was obligated to disclose all material facts, which he did not.

**B.**    **Plaintiffs' Representations in the Subscription Agreements**

The Court also failed to consider the entire Subscription Agreements when concluding

the language of the Agreements barred Plaintiffs from bringing their claim for negligent

misrepresentation.  The Order states, "the potential for liability created by representations of

Lydian Bank's officers under the PPM was eliminated upon execution of the Subscription

Agreement because any reliance on such statements contradicts the expressed language of the

subsequently executed agreement, rendering them unreasonable as a matter of law."  DE 221 at

8.  The Court noted that Plaintiffs "stated that they were only relying on their own experts in

---

[4] Plaintiffs filed Hooper's entire deposition but did not previously cite this colloquy.

making their decision to invest…" *Id*. at 10.  The Court arrived at this conclusion after quoting

certain paragraphs from the Subscription Agreements, including paragraphs 2.1, 3.3, 3.4, and

3.5.

However, the Order omits any analysis of paragraph 2.2, in which Plaintiffs represent and

warrant that they:

> 2.2   …based the decision to invest *solely on the following* and have not been
> furnished with any other placement literature or prospectus:
> (a)   information contained in the [Private Placement] Memorandum;
> (b)   this Subscription Agreement;
> (c)   documents, records, books and other *information referred to in Section 3.3
> of this Subscription Agreement obtained from you*; and
> (d)   independent investigation by me and/or my Purchaser Representative(s).

(emphasis supplied).  Section 3.3 of the Subscription Agreements lists Brown as a person from

whom Plaintiffs could obtain information.  *Thus, Plaintiffs and the Bank both understood and

agreed Plaintiffs could rely on Brown in making their decisions to invest in the Bank*.

At the least, Plaintiffs' representations in paragraphs 2.2(c) and 3.5 are in conflict

because, on the one hand, Plaintiffs represent that they are not relying on statements by Brown,

but only on their advisors, and, on the other hand, Plaintiffs represent that they are relying on

what Brown told them.  Ambiguity raised by the conflict must be resolved in favor of Plaintiffs,

who were not the drafters of the document (or, at a minimum, prevents entry of summary

judgment).  *See, Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1248 (11th Cir. 2002)

(ambiguous term is construed against drafter).

However, those paragraphs may be read together in a manner so as not to conflict.

Paragraph 2.2 appears in a section of the Subscription Agreement entitled "Representations and

Warranties."  In that section, Plaintiffs set forth specific representations and warranties with

respect to entering into the investment, including the due diligence undertaken by them.

Paragraph 3.5 appears in a section of the Subscription Agreement entitled "Investor Suitability."  In this section, Plaintiffs set forth representations and warranties "with the intent that you [the Bank] may rely on them in determining the applicability of such exemptions and my suitability as a purchaser of the shares."  Thus, in paragraph 3.5, Plaintiffs represent that they relied solely upon the advice of their advisors in deciding whether the risks posed by the investment in the Bank's shares were "suitable"[5] for them.  In paragraph 3.5, Plaintiffs did *not* represent that they relied solely upon the advice of their advisors in determining the current condition of the Bank.  There is a fundamental difference between representations of suitability and representations as to due diligence undertaken.

Here, Plaintiffs' representations of suitability go to their status as "accredited investors" under Regulation D, Rules 501-508, 17 C.F.R. 230.501-230-508, of the Securities Act of 1933 (the "Act"), 15 U.S.C. §§77a, *et seq.*  Among other things, Regulation D exempts certain transactions from the typical registration requirements under the Act.  *See In re Integrated Resources Real Estate Ltd. P'ship Sec. Lit.*, 815 F. Supp. 620, 627 (S.D.N.Y. 1933).  However, because these transactions are not registered with the SEC, the registration exemptions apply

---

[5]     The suitability rule is codified in NASD Rule 2310, which provides in pertinent part:

> (a) In recommending to a customer the purchase, sale, or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer under the basis of the facts, if any, disclosed by such customer as to its other security holdings and as to his financial situation and needs.

> (b)  Prior to the execution of a transaction recommended to a non-institutional customer . . . a member shall make reasonable efforts to obtain information concerning:  (1) the customer's financial status; (2) the customer's tax status; (3) the customer's investment objectives; and (4) such other information used or considered to be reasonable by such a member . . . in making recommendations to the customer.

only to transactions involving purchasers who are considered "accredited investors."[6]  As

*Integrated Resources* instructed, Regulation D's limitation of these exemptions to only those

transactions involving "accredited investors" is designed to strike a balance between the

advantages of facilitating special offerings, on one hand, and the dangers of the lack of SEC

oversight, on the other:

> The purpose of these requirements is to facilitate and expedite specially designed
> offerings, while at the same time offsetting the danger posed by the lack of SEC
> scrutiny of the offer and sale by precluding those from participating in the
> offering who are inexperienced purchasers of securities and unable to afford
> professional advice regarding the merits and risks of purchasing the offered
> securities.

*Integrated Resources*, 815 F. Supp. at 628.

Representations of due diligence, by contrast, serve a much different purpose.  In the

securities context specifically, an investor's representations of his or her due-diligence help to

ferret out improper 10b-5 fraud claims by requiring careful and cautious review by the investor.

*See e.g.*, *Thompson v. Smith Barney, Harris Upham & Co., Inc.*, 709 F.2d 1413, 1418 (11th Cir.

1983).  By fostering informed decision making, it protects the stability of the markets at large.

*Id.* at 1418, n. 7.  Investor representations as to their suitability and accreditation are designed to

address whether an investor is qualified to make certain inherently risky investments, while

representations as to the due diligence each investor undertook are designed to protect broker-

dealers from unfair fraud claims and the securities industry as a whole from improvident,

uninformed investors.

---

[6] To qualify as an accredited investor, a "natural person" must have (a) a net worth more than
$1,000,000," or (b) "an individual income in excess of $200,000 in each of the two most recent
years or joint income with that person's spouse in excess of $300,000 in each of those years … ."
*See* 17 C.F.R. § 230.501(a).

Thus, Plaintiffs' representations regarding suitability do not relate to their due diligence, and the Court erred in relying on Plaintiffs' suitability representations to dismiss their claims for negligent misrepresentation.

Moreover, once the wealth management relationship was established between Plaintiffs and the Bank, Brown was acting as Plaintiffs' expert or agent when he advised Plaintiffs to invest in the Bank.  Thus, the language in the Subscription Agreements does not absolve Brown from his duty to provide accurate and complete information to Plaintiffs in connection with his investment advice to them.  Brown cannot hide behind the Subscription Agreement language to release him from his responsibilities and duties to Plaintiffs as their investment advisor.  Thus, the language is not a basis upon which to dismiss Plaintiffs' claims.

C.     **Statements in the Private Placement Memoranda: Forward Looking Versus Present Condition**

The Court concluded that certain paragraphs contained within the Private Placement Memoranda ("PPM"), related to "RISK FACTORS," barred Plaintiffs' reliance on other representations.  *See* DE 221 at 9-10.  The Court stated the "RISK FACTORS" "addressed every subject of any purported misrepresentation or omission made to Plaintiffs and effectively disclaimed liability for Brown's purported omissions."   DE 221 at 9.   In support of this conclusion, the Court cited paragraph 2.1 of the Subscription Agreements and pages 24, 26, and 31 of the PPM, setting forth various risk factors.  But both the Subscription Agreements and the PPM specifically relieve the Bank from liability related only to certain *future* actions or events.  Those risk factors relate to contingencies in the future and not to representations relating to the Bank's present condition.  *Id*. at n. 8.

Indeed, at pages 14-25, the PPM set forth thirty-three "RISK FACTORS," each of which is not a statement of current condition but rather addresses potential adverse conditions that may

negatively impact the value of the shares.  Plaintiffs set forth the thirty-three "RISK FACTORS" in Exhibit E, attached hereto.  Therefore, the language relating to "RISK FACTORS" cannot absolve Brown from liability for misrepresentations made regarding the Bank's present condition, which form the basis of Plaintiffs' claims.

In the sections below, Plaintiffs set forth two affirmative, material misrepresentations upon which they are proceeding, to demonstrate they relate to statements of present condition.[7]

### a.      Satisfaction of Terms of the Memorandum of Understanding (MOU)

The PPM declare that "the bank had already completed the implementation of practices and procedures on its initiative that the bank believes satisfy many terms of the Memorandum." DE 151-2 at 32.  This statement does not merely place Plaintiffs on inquiry notice that there is a MOU.[8]  Rather, it constitutes Brown's representation that the Bank already had resolved all of the issues the Office of Thrift Supervision (OTS) identified in the MOU.  Plainly, Brown represented that the Bank had no regulatory issues at that present time.[9]  But that was false.  At the time the PPM were issued to Plaintiffs, the Bank was not even close to complying with the MOU.  *See* DE 179 at ¶ 23 (Response).  Plaintiffs' expert opined that the statement regarding the MOU was incorrect, based on the fact that the Office of Inspector General Audit Report dated March 21, 2012 ("OIG Report") disclosed several instances of persistent non-compliance with

---

[7] Based on the fiduciary relationship, Plaintiffs also rely on material omissions as a basis for their breach of fiduciary duty claim.

[8] Indeed, if it is construed as placing Plaintiffs on inquiry notice that the Bank had regulatory problems, Plaintiffs would have been stymied in any attempts at further due diligence about the MOU, due to the confidential nature of MOUs.  *See* 12 U.S.C. 481; 5 U.S.C. 552(b)(8); 18 U.S.C. 641, 1906; and 12 CFR 4.12, and Part 4, Subpart C.

[9] As the person with ultimate authority over the contents of the PPM, Brown is responsible for the representations made therein.

the MOU.   *See* DE 179-7 at 10-11 (Preliminary Expert Report of Patrick F. Gannon ("Gannon

Report"), Exhibit G to Response).  The OIG Report was scathing:

> During their 2011 examination, OTS examiners noted that the corporate
> governance remained a serious supervisory concern as OTS's review disclosed
> several instances of noncompliance with the C&D order and the earlier
> memorandum of understanding (MOU).  The board and management failed to
> comply with enforcement documents, remedy the thrift's declining financial
> condition, or correct the thrift's unsafe or unsound practices, which substantially
> dissipated Lydian's assets and earnings and depleted the thrift's capital.

DE 179-9 at 6 (OIG Report).

It is also apparent from FDIC documents (produced after all briefing had closed) that, as

of June 2, 2009, the Bank had *not* "already completed implementation of practices and

procedures" that satisfied the terms of the MOU.  As of October 8, 2010, in a "Regulatory Status

Report to Board," the Bank reported that it was "currently managing three major regulatory

orders," including "the 2009 Memorandum of Understanding (MOU)."  *See* FDIC-P-000404501-

4507 at page 5, attached as Exhibit F.  As of October 12, 2010, key components of compliance

with the MOU remained incomplete, as reported by Protiviti, a company hired by the Bank to

track its response to the various regulatory actions.   *See* OTS Deliverable Status as of

10/12/2010, FDIC-P-000406639-6641, attached as Exhibit G.  It was only on October 18, 2010,

that the Bank established a "Director's Oversight Committee of Lydian Private Bank," the

purpose of which was to "monitor and coordinate the [Bank's] compliance with and the

completion of all corrective actions required by," among other things, "the OTS Memorandum of

Understanding (MOU) effective dated May 21, 2009."  *See* FDIC-P-000406657-6659, attached

as Exhibit H.[10]  It is clear that the Bank could not have satisfied all of the MOU's terms by June

2009.

REDACTED.  The May 21, 2009 Memorandum of Understanding between the Bank

and the OTS was finally produced to Plaintiffs on October 29, 2012, after briefing on Summary

Judgment was closed and only one day before this Court's Order on Summary Judgment [DE

221].  The MOU makes clear that another representation made by Brown and the Bank in the

PPM, relating to the Bank's present condition, was simply untrue.  Without entry of the Second

Confidentiality Order, the OCC has not allowed Plaintiffs permission to provide the document to

the Court, nor can Plaintiffs make reference to the subject-matter contained within the MOU.

Upon the Court's entry of the Second Confidentiality Order, Plaintiffs will file an un-redacted

version of this Motion, as well as the MOU, under seal for the Court's review.

### b.       Information Regarding the Bank's Capital

The PPM claimed the Bank had $99 million in capital as of March 2009.  DE 151-2 at 58.

That was false.  In fact, a material portion of the $99 million in equity was improperly counted as

equity in violation of GAAP, a misrepresentation that was engineered by Brown.

Of the Bank's purported $99 million in equity, a critical $15 million was attributed to

Sherman Financial Group, based on its "purchase" of $15 million in preferred stock in

September 2008.  DE 152-2 at 28.  However, documents produced by both the FDIC and

Sherman *after* briefing on the summary judgment motion had closed show that the Sherman

transaction included an interrelated $20 million loan, which made the inclusion of the Sherman

"equity" a violation of GAAP from the outset.  An August 20, 2008 Term Sheet, detailing the

terms of the entire Sherman transaction, included: (1) the $20 million loan from the Bank, (2) a

---

[10] These documents were produced on October 29, 2012.  *See* Kolmansberger Decl., Exhibit B at
¶ 9, Ex. A.

purchase and sale agreement and commitment and servicing agreement, all related to a loan pool service by Sherman affiliate Credit One Financial Services, and (3) the purchase of $15 million in preferred stock by the Sherman group. *See* Document No. FDIC-P-000009137–9140,[11] Exhibit I (listing all three transactions under the heading "Sherman Financial Group Summary of Terms August 20, 2008").  Sherman produced documents, after briefing closed and days before summary judgment was entered, that also reveal the interrelated nature of the loan/stock purchase transaction. *See* SFG-BVS-00000710, Exhibit J (Email between Brown and Sherman discussing loan and preferred stock as part of greater, connected transaction including the loan pool service); Document No. SFG-BVS-0002360-2361 (in which Sherman states it wants the "Preferred Stock and COFS [loan pool service] purchase to be funded simultaneously"); and Document No. SFG-BVS-00002371, Exhibit K (discussing payment by Bank for purchase of loan pool, simultaneous with Sherman's payment of $15 million to "purchase" preferred stock; "you send your $75mm, I send my $15mm (or you send $60mm)).[12]  Because the loan and the stock purchase were part of an interrelated transaction, a fact well known to Brown because he was the architect of this transaction, the inclusion of the Sherman preferred stock as equity in the Bank was a violation of GAAP, and a statement that was materially false.  *See, e.g.,* Gannon Dep. at 78:9-22; 83:17-84:8 (where Plaintiffs' expert opines as to materiality of $15 million).

It is now apparent that the impropriety of listing the Sherman preferred stock as equity was known to Brown from the outset.  It was only by subterfuge and obfuscation that Brown was able to convince the Bank's auditors to permit the inclusion of the Sherman preferred stock as

---

[11] This document was produced on October 29, 2012.  *See* Kolmansberger Decl., Exhibit B at ¶ 9, Ex. A.

[12] These documents were produced on October 24, 2012.  *See* Kolmansberger Decl., Exhibit B at ¶ 12.

equity and, thus, to mislead Plaintiffs by making the claim that the Bank had $99 million in equity.  These facts should be presented to a jury.

      **c.**    **REDACTED**

The MOU makes clear that *yet another* representation made by Brown and the Bank in the PPM, this time relating to the Plaintiffs' return on investment, was simply untrue.  Upon the Court's entry of the Second Confidentiality Order, Plaintiffs will file an un-redacted version of this Motion, as well as the MOU, under seal for the Court's review.

      **D.**    <u>**Availability of Audited Financial Statements**</u>

The Order notes that Plaintiffs could have obtained the Bank's audited financial statements and other "information readily available to the bank" and that Plaintiffs' failure to do so "effectively disclaimed any right to pursue Brown for negligent misrepresentation as a result of his purported omissions."  DE 221 at 10.  Yet, even if Plaintiffs had reviewed the audited financial statements for the year ended December 31, 2008, those statements would not have revealed Defendant's misrepresentations and omissions.  Indeed, those statements were required to be "restated" (i.e., corrected) in 2010, well after Plaintiffs invested.  *See* DE 179 at ¶ 14 (Response, citing Gannon Report attached as Exhibit G thereto).

Moreover, as set forth above, as wealth management clients, Plaintiffs hired and relied upon the Bank and its advisors to advise them as to the propriety of investments.  *See, e.g.,* Investment Management Agreement between Hooper and Lydian Bank, Document No. BBSH01758-59, attached as Exhibit D, and Investment Management Agreement between BVS and Lydian Bank, Document No. BBSH02223-30, attached as Exhibit L, each at page 1 ("[Y]ou appoint Lydian as your investment manager to act on your behalf with authority to buy, sell and otherwise effect investment transactions for the assets in your Account, and Lydian accepts that

appointment.")  The fact that Bank documents may have been available for Plaintiffs' review does not diminish Brown's duty of complete candor and fidelity as Plaintiffs' investment advisor.

**E.      Ellis's Commission on Plaintiffs' Investment Was an Undisclosed Material Fact**

The Order stated that Plaintiffs "failed to produce evidence" demonstrating that Plaintiffs' decision to invest in Lydian Bank would have been affected, had they known of Ellis' commission.  DE 221 at 10-11, n. 11.  The Court relied on an incomplete quote from Ceruzzi's deposition stating he was interested in understanding the Bank's condition. DE 179-1 at 153:25-154:4 (Ceruzzi Dep.).  The remainder of Ceruzzi's answer in the cited quote was, "I asked, and all those answers were answered by Mr. Ellis and Mr. Brown."  *Id*.  This answer itself reflects the materiality of the issue with respect to whether or not Ellis was obtaining or was receiving a commission for his services because it demonstrates that Ceruzzi relied upon Ellis, as his advisor, to provide him with unbiased information.  Because Ellis was receiving an undisclosed commission, he could not be an impartial advisor.  Brown never challenged the materiality of the undisclosed commission paid to Ellis.  Thus, Plaintiffs did not muster evidence on this point.

Both Hooper and Ceruzzi testified that they had a prior long-standing commercial banking relationship with Ellis, and that they had not been aware of any circumstance in which Ellis previously received a commission on any of their prior dealings.   Hooper's prior relationship with Ellis was as a mortgage broker employed by Merrill Lynch. DE 179-2 at 18:7-24 (Hooper Tr.).   It never occurred to Ceruzzi to inquire whether Ellis was receiving a commission with respect to his investment in the Bank. DE 179-1 at 216:11-217:4 (Ceruzzi Tr.).  Hooper also was unaware that Ellis would receive a commission.  DE 179-2 at 105:18-21,

196:16-24 (Hooper Tr.).  Whether that knowledge would have affected their decision to invest should have been a jury question.

Plaintiffs testified that they relied on statements by Ellis and Brown in making their investments in the Bank.  Had Plaintiffs known that Ellis stood to receive a hefty commission from the closing of this transaction, a reasonable jury could have found that it would have affected Plaintiffs' decision to rely on his statements and disclosures.  *See* Hooper Decl., Exhibit M at ¶¶ 2-6; Ceruzzi Decl., Exhibit A ¶¶ 3-7.

## F. <u>Defendant Brown's Role</u>

The Court apparently concluded that Brown, the Bank's former dominant CEO, had a very minor role, having "only met Plaintiffs on two separate occasions" and "described as having a demeanor similar to that of a 'cheerleader.'"  DE 221 at 15.  Thus, the Court concluded that "Plaintiffs have failed to present special circumstances which justify a finding of the existence of a fiduciary duty."  *Id*.

But there is substantial record evidence that would support a contrary conclusion:

(1)     Brown was a controlling and dominating CEO of the Bank; *See* DE 179 at ¶¶ 14, 15, 17, 20, 21, 25, and 27 (Response);

(2)     Brown either provided Ellis with the information to provide to Plaintiffs or approved of all the information that Ellis provided to the Plaintiffs in connection with their investment; *Id*. at ¶¶ 14, 17, 21, 25, and 27.

(3)     Brown orchestrated the improperly-accounted Sherman deal; *See* Document No. SFG-BVS-00000710, Exhibit J;[13] and

---

[13] This document was produced on October 24, 2012.  *See* Kolmansberger Decl. at ¶ 9, Exhibit A.

(4)     Brown was the final authority on information disseminated by the Bank to potential investors.  As the ultimate authority through which all decisions were made at the Bank, Brown was responsible for the misleading and untrue statements made in the PPM.  *See, e.g., Local 703, I.B. of T. Grocery & Food Emp. Welfare Fund v. Regions Fin. Corp.*, Case No. No. CV: 10-2847-IPJ, 2011 U.S. Dist. LEXIS 93873 (N.D. Ala. Aug. 23, 2011) (finding officers and directors liable for false and misleading statements as they were the "ultimate authority" over statements); *City of Roseville Emp. Ret. Sys. v. Energysolutions, Inc.*, Case No. 09 Civ. 8633-JGK, 2011 WL 4527328, *17 (S.D.N.Y. Sept. 30, 2011) (finding parent company liable for subsidiary's false statements, noting parent company "had control over the content of the message, the underlying subject matter of the message, and the ultimate decision of whether to communicate the message."); *In re Merck & Co. Sec., Derivative & ERISA Litig.*, Case Nos. 05–1151 and 05–2367, 2011 WL 3444199 *24-25 (D.N.J. Aug. 8, 2011) (finding officer of company "maker" of statement because statements were directly attributable to him and made "pursuant to his responsibility and authority … .").

## IV.     Memorandum of Law

### A.     Plaintiffs' Status as Wealth Management Clients Established a Fiduciary Relationship and Required Brown to be Truthful in his Solicitation of Plaintiffs as Investors.

Pursuant to Section 518.10, Florida Statutes, because Plaintiffs were wealth management clients of the Bank, the Bank and its officer and agent Brown were fiduciaries.  Section 518.10 provides that a "fiduciary" includes a "person, whether individual or corporate, who by reason of a written agreement . . . has the responsibility for the acquisition, investment, reinvestment, exchange, retention, sale, or management of money or property of another."  Moreover, a person to whom monies are entrusted for investment is clearly a person in whom trust has been reposed.

Pursuant to common law, any such person is a fiduciary. *See First Nat. Bank & Trust v. Pack*, 789 So. 2d 411, 414-15 (Fla. 4th DCA 2001); *Ward v. Atlantic Sec. Bank*, 777 So. 2d 1144, 1147 (Fla. 3d DCA 2001) (applying *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042 (11th Cir. 1987), and finding that bank owed its clients fiduciary duties).  Thus, the conclusion that there was no fiduciary relationship is erroneous.  *See* DE 221 at 13-15.

Equally mistaken is the Court's conclusion that no fiduciary relationship had been established between Plaintiffs and Brown.  Once Brown, as the Bank's officer and agent, undertook to solicit Plaintiffs, as wealth management clients of the Bank, to invest in the Bank, he established a fiduciary relationship with Plaintiffs beyond the general broker-client relationship.  *See, e.g., De Kwiatkowski v. Bear, Stearns & Co. Inc.*, Case No. 96 Civ. 4798 (JGK), 1999 U.S. Dist. LEXIS 19966, *38 (S.D.N.Y. Dec. 22, 1999) (finding broker engaged in "substantial advisory function" and denying defendant's motion for summary judgment).

Because Brown owed Plaintiffs a fiduciary duty, he was required to speak truthfully and disclose material facts to Plaintiffs in connection with their stock purchase.  *See United States v. Laurienti*, Nos. 07-50240, 09-50081, No. 07-50358, No. 07-50365, No. 07-50367, 2010 U.S. App. LEXIS 11594, * 20 (9th Cir. June 8, 2010) ("A broker has a duty to disclose material information about a stock purchase if the broker and client have a fiduciary relationship or a similar relationship of trust and confidence."); *Artec Group, Inc. v. Chugach Mgmt. Servs.*, 470 F. Supp. 2d 1353, 1356 (M.D. Fla. 2006) (finding claim for the parallel claim of fraudulent misrepresentation was properly alleged when the complaint stated that defendant "voluntary undertook to disclose some information but failed to disclose material facts" of which it was aware); *Nicholson v. Kellin*, 481 So. 2d 931, 936 (Fla. 5th DCA 1985); *Johnson v. Davis*, 480 So. 2d 625 (Fla. 1985); *S & B Investments, LLC v. Motiva Enterprises, LLC*, Case No.: 03-

61993-civ-MARTINEZ, 2004 U.S. Dist. LEXIS 27502 (S.D. Fla. 2004) (finding a duty to disclose when plaintiff alleged that defendant chose to speak, but failed to be truthful and forthcoming; "a party can stay silent, but it cannot lie or tell a half-truth").   The record demonstrates both a duty and a breach, at the least a jury issue.

### B.    Newly-Discovered Evidence Supports Reconsideration

Substantial newly discovered evidence first became available after the closing of briefing on the Motion for Summary Judgment and entry of the Court's Order on October 29, 2012.  [DE 221].  After the briefing on Summary Judgment had been closed with the filing of Plaintiffs' Reply Brief on October 5, 2012, [DE 185], the following voluminous discovery was provided to Plaintiffs, the majority of which was produced only days before the Court entered its Order:

1.   October 16:  The first wave of non-privileged FDIC documents was produced directly by the FDIC, which consisted of approximately *9,000* documents. (These documents had been subpoenaed by Plaintiffs in June 2012). [FDIC-P-000000001-000399729]

2.   October 22: Brown produced an additional *3,600* documents and noted that he "will continue to produce, on a rolling basis, any additional non-privileged documents that are identified upon further review."  [FDIC-P-00016280-000399687]

3.   October 24:  Initial documents were produced by third party Sherman Capital, consisting of approximately *1,700* documents.  [SFG-BVS-00000001 - 00004482]

4.   October 26:  Brown produced *1,800* documents (nearly *18,500* pages), again, noting that he "will continue to produce, on a rolling basis, any additional non-privileged documents that are identified upon further review."  [FDIC-P-000000394 - 000400629]

5.   October 26:   Sherman Capital produced an additional *1,000* documents, comprising *7,000* pages.  [SFG-BVS-00004483-00011069]

6.   October 29:  Brown produced *8,000* documents, again, noting that he "will continue to produce, on a rolling basis, any additional non-privileged documents that are identified upon further review." Brown's counsel further

advised that the "final" production could be delayed due to Hurricane Sandy. [FDIC-P-000000057-000407760]

7. October 29: The Sherman Capital and Newman depositions in New York were postponed because of Hurricane Sandy and have yet to be rescheduled.

Kolmansberger Decl. at ¶¶ 6-9, 12-13, and Exhibit A.

Indeed, even after this Court entered its Summary Judgment Order on October 29, 2012 [DE 221], significant discovery had not yet been completed. Brown has not completed production of documents that were supplied to him by the FDIC for a privilege review, nor has he produced a privilege log, despite repeated requests. *Id*. at ¶ 6. Plaintiffs also await production of documents from the OCC, which had been approved in part (releasing a privilege on some documents) and then delayed as a result of the entry of the Court's Order [DE 221]. *Id*. at ¶ 13.

Plaintiffs' counsel worked diligently to review the documents produced to them well after discovery closed, after the deadline for amending pleadings, and after the closing of briefing on the Motion [DE 155]. The newly discovered documents are not merely cumulative or impeaching; rather, they provide new insight into the misrepresentations in the Private Placement Memoranda, as well as the relationship between the parties. The newly discovered documents provide ample grounds for this Court's withdrawal of its Order [DE 221]. As set forth above, the newly discovered documents demonstrate:

1. BVS entered into a Wealth Management Agreement with the Bank, as evidenced by newly discovered document number BBSH02222-2230. *See* December 19, 2012 Ceruzzi Declaration, Exhibit A.

2. Brown knew that, rather than there being three separate transactions between the Bank and Sherman (the Bank's purchase of a Sherman-related entity's loan pool, the Bank's issuance of a loan to Sherman, and Sherman's purchase of $15 million in the Bank's preferred

stock), those transactions were intertwined.  *See* FDIC-P-000009137–9140, Exhibit I; SFG-BVS-00000710, Exhibit J; and SFG-BVS-00002371, Exhibit K.[14]  Thus, the Sherman stock purchase should never have been counted as equity and the Bank did not have $99 million in equity as of March 2009, contrary to the representations made in the PPM.

      3.      Brown knew that the Bank had not complied with the terms of its MOU with the OCC, but he falsely represented to Plaintiffs otherwise, both orally and in the PPM.  *See* FDIC-P-000404501-4507, Exhibit F; FDIC-P-000406639-6641, Exhibit G; FDIC-P-000406657-6659, Exhibit H; **REDACTED**; and FDIC-P-00000127-137, Exhibit N.[15]

      4.      **REDACTED.**

This newly discovered evidence is overwhelming and material to Plaintiffs' claims and, in light of such evidence, the Court could not have concluded, as a matter of law, that (1) Plaintiffs were not wealth management clients of the bank and, thus, no fiduciary duty arose or (2) that no material misrepresentations were made to Plaintiffs.  As such, reconsideration of the Court's Order [DE 221] is warranted.  The summary judgment order should be vacated and the case set for trial.

**CONCLUSION**

For the foregoing reasons -- primarily newly discovered evidence that was late-produced discovery containing material information supporting Plaintiffs' claims and, at the least, creating a genuine issue of fact -- the Court should reconsider and vacate its Order granting summary judgment, and set this case for trial.

---

[14] The FDIC document was produced on October 29, 2012, and the SFG documents were produced on October 24, 2012.  *See* Kolmansberger Decl., Exhibit B at ¶¶ 9, 12, and Exhibit A.

[15] These documents were produced on October 29, 2012.  *See* Kolmansberger Decl., Exhibit B at ¶ 9, Exhibit A.

Respectfully submitted,


  s/ L. Louis Mrachek_____
L. Louis Mrachek, Esq.
Florida Bar No. 182880
lmrachek@pm-law.com
Page Mrachek Fitzgerald Rose Konopka &
Dow PL
505 S Flagler Dr Ste 600
West Palm Beach, Florida 334015945
Phone: 561.655.2250
Fax: 561.655.5537
*Counsel for Plaintiffs*

Mark F. Raymond, P.A.
Florida Bar No. 373397
mraymond@broadandcassel.com
Rhett Traband, P.A.
Florida Bar No. 0028894
rtraband@broadandcassel.com
Broad and Cassel
One Biscayne Tower, 21st Floor
2 S. Biscayne Blvd.
Miami, FL 33131
Phone: 305.373.9400
Fax: 305.373.9443
*Co-Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 10, 2013, I served the foregoing document upon all parties in the attached service list via CM/ECF for non-confidential portions and via electronic and U.S. Mail for confidential portions and exhibits.

_s/ L. Louis Mrachek_____
L. Louis Mrachek, Esq.

## <u>S E R V I C E   L I S T</u>

BVS ACQUISITION CO., LLC et al v. RORY A. BROWN, et al
UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA
Case No. 9:12-CV-80247-DMM

Joel M. Miller
Charles R. Jacob III
Amanda F. Parsels
MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, New York 10022
(212) 336-3500
Email: JMiller@mw-law.com
*Counsel for Defendant Rory Brown*

Benjamin P. Brown, Esq.
Matwiczyk & Brown, LLP
625 North Flagler Drive
Suite 401
West Palm Beach, Florida 33401
P: (561) 651-4004, ext. 13
F: (561) 651-4003
Email: bbrown@matbrolaw.com
*Counsel for Defendant Rory Brown*

Mark F. Raymond, P.A. (373397)
Rhett Traband, P.A. (0028894)
Broad and Cassel
One Biscayne Tower
2 South Biscayne Blvd.
21st Floor
Miami, Florida  33131
Telephone: 305.373.9400
Facsimile: 305.373.9443
*Co-Counsel for Plaintiffs*

Beverly Pohl (907250)
Broad and Cassel
One Financial Plaza
100 S.E. 3rd Avenue
27th Floor
Fort Lauderdale, Florida 33394
Telephone:  954.745.5249
Facsimile: 954.713.0962
*Co-Counsel for Plaintiffs*